Good morning, Counsel. Good morning, Your Honors. May it please the Court, I am John Bowler of the Troutman Sanders Law Firm representing Empire Distribution. We are I've reserved two minutes of rebuttal time. We are asking this court to reverse the District Court's grant of summary judgment and to send this case back down to the District Court for trial. This case is no different than any trademark case or other case where there are genuine issues of material disputed. Actually, Counsel, with respect, that's probably not accurate. You, of course, have the issue of the First Amendment and the impact, if any, of the Rogers case and ESS Entertainment and a lot of other cases. I have some questions. I'm sure my colleagues do. I don't want to interrupt your throw of thought, but I think the Court concluded that the Rogers test doesn't include a cultural significance inquiry. What's your best argument that it does? The strongest, first of all, if you look at what protected speech is, we typically, the classic cases of fair speech are parody, satire, commentary of a social nature. Things like that are implicated when marks take on the significance of a mark like a Rolls-Royce that can't be referred to any other way or products that are difficult to describe but for saying things like aspirin. That's not empire. When you look at the, and this is assuming that the Rogers test applies, we have a primary argument. We don't even get there. Sure. But if you look at the, if you look at, even if the Rogers test is applied. Before we get to that, I want to ask about the cultural significance. The District Court said it doesn't apply. It has some importance to me anyway. What does ESS Entertainment 2000 say about that issue? ESS, that's a very, very good question. Because I think if we look at the two Mattel, if we look at the two Mattel cases, your honor, and we look at the Brown case, they clearly had references that were culturally significant. ESS, I think the best, there really isn't a cultural argument that was made in that case or addressed. The court kind of sidestepped it and said that the complainant missed the point because the court went directly into the referential analysis, which I'm prepared to talk about today. So the, I think ESS is maybe the weakest part of our argument that this circuit requires a cultural significance. Okay, and do I understand correctly that empire distribution does concede that empire is an expressive work? No, we don't agree with that. Okay. We don't agree with that. In fact, we say it's not an artistic, we argued that before. Where in your brief do you say that it is not? I thought it was the other way around. I say that it's not an artistic work if they have, if there's, an expressive work. Yeah, if there's any minimal expression, your honor, I mean in terms of them saying it's an apt, naming our show, you know, Empire is an apt association, that meaning is outweighed by the Lanham Act. No, I, again, I get all of that and I know you're gonna argue the rest of the, you know, prongs and whether or not Rogers applies, but I guess my concern is I wanted to kind of work down this and the question I have is does the, you know, the television show and the theme and the setting and so on, is that an expressive work? No, it has an element. It is art in the sense that it, like a book, like a book or like a movie, it has a plot and a dialogue, characters, but it also sells, you know, would it be something that would be covered by the Again, there's a lot of hard things we need to argue about here, but this isn't one of them, is it? Well, are you in the Rogers test or are we still out? Well, I'm not gotten there yet. I just want to know whether the Fox's use of Empire in the connection of the show and the theme of the show is an expressive work, yes or no? I say no, because it's using the, it's using the show as a platform. Well, then you've got to separate it. Would you concede at least that, and you don't have to concede, but that the show is an expressive work, but then there could be other uses that you may, that's more debatable in your view, but to say that a television show isn't an expressive work, I think that's a hard position to take, whether we're in the Rogers test or not. I understand, Your Honor. What I would say is that the, there is a difference, in the sense they're using a, even if the, even if the show is an expressive work, you can't take the First Amendment, you can't take protection in one form of art and then put it into a, then go launch and record and distribute music and cloak that under the guise of the First Amendment. Well, with respect, counsel, I'm gonna be talking the other side a little bit in the swag and the rest of that, because that may be a different issue, but the television show itself, I mean, in a way, it's kind of a classic Rogers case situation. There they had, you know, the two famous dancers, and then you had two kind of pathetic post-war victims. It was kind of a parody. Here you've got a whole different situation. You've got a music business. We get that. You don't want them to compete in the, in the music business and in the concerts and so on. They have a television show, and it's about people that are in that business, but it's, it's an entirely different theme than what you're talking about. What's the difference between that and, say, the Rogers case? Well, the thing, Rogers itself, Your Honor, Rogers did mention the, you know, proverbial pair of shoes, that it might have been a different situation if they were selling shoes, and, but Rogers also said it would be ironic if, in the name of the First Amendment, courts did not recognize the rights of others to protect titles of their creative works against infringement by other authors, so even before you get to Rogers, the Rogers test acknowledged the concept. It recognized that the same mark and competitive context favors application of the two different, if you will, products here. On the one hand, you've got the television show and the spin-off of that, and then you've got the music business with the albums and the t-shirts and the schwag and all that stuff that has arguably nothing to do with the TV show. Do you agree that there's a difference for purposes of our analysis? Your Honor, I, no. You don't? That's not helpful to you. No. What I'm saying is they're using the show. They're combined in the sense that they're using the show as a platform. Let me ask you this. I've got on page ER, let's see, 505, 506. I've got pictures of a bunch of albums. Right. They're in part, have nothing to do with the show. Nothing. Whatsoever. It's music, different things, and so on. Now that's one thing. Your client's in that kind of a business as well, but your client's not in the TV business and producing shows like this. So I ask you again, isn't there a difference between the TV show and what it's going on there, which may be pure Rodgers, versus maybe footnote five of Rodgers, which is your issue? I concede that point, Your Honor. So there is a difference. I concede that. Okay. We have in our circuit adopted the Rodgers test. So I think, at least for me, you're swimming uphill in saying that we're outside of the Rodgers context, but focusing you on footnote five, to follow up on Judge Smith's point, we've never adopted that footnote. Would this be the first panel to do so? It would be. In the Ninth Circuit, it would be. Is there a reason why we should? I think that it makes, I think that, yes, I do think it should, because it goes back to that point that it would, again, it'd be ironic if you let, it'd be very unfair to artists like my client if you set up the standard that did not recognize the rights of authors to protect their titles. Well, why doesn't the second prong of Rodgers take care of that? Because under Rodgers, if a title explicitly misleads as the source or content, that basically gets to the situation that you're really concerned about. Here's the issue that we're jumping into the test. If we take the artistic relevance test, right, and a test, and a mark is used that is relevant to the work, but it's not referential, right, so you got a mark that is relevant but not referential, which Fox concedes this isn't, then you've really collapsed the test into a one-part test, because how could a, because the second part of the test requires it to be explicitly misleading as to the source, and if a mark is not, is making no reference at all, admittedly, to the complainant's mark, then how could it ever be explicitly misleading? It's almost like a go to jail, you know, go straight to jail, don't pass, go. Well, you're really, I'm sorry, go ahead. No, I just think, I think your referential argument is just crazy, because if you have to have, it would seem to me that you're less, your case is stronger if there is no referential, your case is weaker if there is a referential thing. I just, I really don't get that argument at all. So if you, if you're trying to persuade me, I'd go on and try to talk about this footnote five, and has the Second Circuit ever given that, the Second Circuit, now I'm talking about, given that an independent meaning? So what, so in the Second, the Second Circuit has two cases, Your Honor, following. Well, they have Twin Peaks, and welcome to Twin Peaks. They didn't give it any independent meaning there. They didn't say that that, it had applied there, did it? No, but the, what the court did do is it applied a, it did chastise the District Court for not applying a likelihood of confusion analysis when it considered the explicitly misleading prong. It, it, it specifically went through the, that said the venerable. So did they find an infringement? It was a, it was a, now it was, it was a finding of infringement that I, a finding of non-infringement that was affirmed. But in the District Court analysis, Your Honor, it's, it, it mentioned that the court should have done, that the appellate courts can do that sometimes in their appellate capacity. But it didn't suggest that this footnote that you're relying on made the difference. It would require reversal, did it? No. No. And even, even in this circuit, if you look at the ESS case, which Your Honor mentioned, it didn't say that it was applying the Sleekcraft factors, but in a sense, that's what it did when it looked at the explicit, it went through and talked about the love and marriage. Yeah, it was. Well, that's why I asked about the second factor of the Rogers test and whether it doesn't really get to the same thing. I mean, these are very fact-specific inquiries that involve balancing First Amendment rights. And in my research, since Rogers was written, it's been, that footnote has been cited only once, and that's in the Second Circuit. And I don't think the analysis really turned on it either. So you're asking us for the first time to explicitly adopt that footnote that no other has really felt comfortable going there. Counsel, I don't mean to interrupt you, but you wanted to save some of your time. You don't need to do so, but you've got two minutes and 10 seconds left. Do you want to save any of it? You don't have to. No, I will save two minutes. Okay, great. Thank you. Thank you. Good morning. Morning, Your Honors.  The Court. Daniel Petruccelli with my colleague Molly Lenz for Respondents to the Fox Parties. You know, I think perhaps I could be most helpful by addressing the same questions that you put to my esteemed counsel, opposing counsel, and I would be happy to answer any additional questions. But on the cultural significance issue, that was addressed directly by the party in the SS case, and the Court rejected that there was any requirement that a mark to be used in an expressive work needed to have some cultural or iconic significance. And indeed, in that case, the mark did not. It was a nondescript strip club in L.A. Secondly, with respect to the issue of the expressive works and whether the show and the music and other items are covered, as the district court observed below at the excerpt of record, page 18, and as the appellate itself observed in its own reply brief at page 1, they do not dispute that the show and the soundtrack would be governed by Rogers except for their title-to-title argument, which I'll address. So there's never been any dispute that both the show and the music are expressive works. With respect to your inquiries, Judge Smith, I would divide the items involved in this case into three categories. One is the show itself, and two is the music. And to be clear, the only music involved here is the soundtrack music from the show, two that contain only songs from the show itself. And I would address the court to excerpt of record 834, and then there's another example at 836. And what we have here is the cast members, the title of the show, and it says original soundtrack from season one, and then the names of the songs from the show. And it makes clear here that the record company is Columbia Records, pursuant to a contract. Counsel, let me, with respect, whether we divide this into three or two, at least with respect to me, I get the Rogers about the TV show and so on, and the district court did a pretty good job, I thought. What I'm troubled about with, and you probably can't see this, but this is from 505, these are some albums that have nothing to do with the TV show. I wanted to address that. Okay. All right. Let's talk about those. That's not Fox's material. That's the plaintiff's. It's hard to read. It took me a long time to understand. Okay. So you say that this is not your material. That's absolutely correct, Your Honor. If you're referring to excerpt of record 505, those are appellant's materials. Okay. We never put any of that. They're putting in for comparison. I can say, as I understood it, this is appellant's declarant that attached certain things, but you're saying what was attached was not your material. It's their material. No. This is 834 and 836 are our compilation albums solely from the show, and they are an integral part of the show, and they tell the story of the show, and frankly, Your Honor- It's 834 and what? 836. And 836. Do I have your representation, then, that Fox and Columbia, in connection with this particular show, is not doing separate recording artists and putting it out under Empire and not doing, if you will- That is correct. Musical extravaganzas and so on. Yeah. There is no evidence in the record that any songs have been released with reference to from the show, music played during the various episodes. Exactly. Can I take you back to your third bucket? Were you going to say merchandising? I was. Yes. I was, Your Honor. And as to merchandising, the district court, if I'm correct, didn't really get to the merit of that because it was really on reconsideration. The district court said that you, meaning Empire Distribution, didn't put into evidence support that Fox sells merchandising goods. No, that Empire Distribution was referenced to the appellant, not us. Right, right. Yes. And so is there evidence? Was there evidence submitted? Was the district court right about that? Yes, the district court was absolutely right. The appellant never made an argument in the summary judgment proceedings, and this was pointed out in the judge's order denying their motion for reconsideration. The one piece of evidence that I did find in opposition to the motion for summary judgment is a deposition by, I think, Mr. Bywater, who said that he saw merchandise with the Empire logo on it, including hats, primarily stuff that's been given away at promotional activities. To be clear, yes, Your Honor, Fox did engage in the selling of consumer products related to the show. But they were all related to the show, not something separate. Yes, but the judge's point was that when the summary judgment motion occurred, appellant never made an argument that's separate and apart from the show and the music. Even if you rule against me on Rogers, on the show and the music, let's just isolate and talk about consumer products. There was never an argument made with respect to consumer products. There was never any showing of likelihood of confusion with respect to consumer products, assuming Rogers did not extend that far. So bucket number three was never presented to the district court for consideration? That's exactly correct, and that's exactly what the court concluded when this issue crystallized in the — that his finding was there was no consumer confusion with respect to these products. Okay, I will get you the — Well, I have it here somewhere, too. No, Your Honor, there were two findings. It's on page four of his order. I don't — This was on the motion for reconsideration? Yes, yes, and he wrote there, The court thus agreed with Fox's contention that these alleged ancillary uses were not properly before the court in the motion for summary judgment, or to the extent they were, they were only used to support Empire Distribution's source-identifying function argument. And so the references in the record to the consumer products were being made by the music and the show from the scope of Rogers' protection, not to make a separate cognizable claim on the consumer products. The court then goes on to say, however, the court agrees that the use of a mark on a commercial good is not the type of expressive activity which is protectable under Rogers. Despite this, even if Empire Distribution had adequately put these commercial uses before the court, it is clear it did not put forward any evidence demonstrating a likelihood of confusion which would have justified denying the motion for summary judgment. So for our purposes, then, Mr. Petrocelli, footnote five, whatever it's worth isn't worth anything in this case because the issue was never put to the district court to consider with respect to schwag and merchandise and so on. So we don't need to decide whether there was any confusion using sleek craft or anything else. That is correct. Is that correct? It was not put before the court. They had their opportunity. They made a tactical decision not to, and that was pointed out. So it's a subject for another day, but not this one. Well, Your Honor, I might argue that under principles of race judicata, it's not the subject of another day. I don't mean in this case, but I mean... But in fairness to the other side, I thought their footnote number five argument was an argument that they would apply to everything, not just to the schwag. I would like to turn to footnote five. Yeah. Okay. Now, footnote five, we're talking about footnote five in the Rogers case, right? Right. Footnote five in the Rogers case is making an observation that if we're comparing a that's what we're doing, the appellant's corporate name versus a title of an expressive work, then we're into the world of Rogers. If we're talking, however, about title versus title, okay, let's say that we made a show called, instead of Empire, Harry Potter or The Bachelor. Now, it's not title versus commercial name or product. It's title versus title. And in that case, the Second Circuit observed that we would not necessarily be applying Rogers because it would not be fair to the senior user to be up against the hurdle of the First Amendment when a junior user comes along and takes the same title. That's not the case. The court actually talked a little bit about that dilemma in Rogers, did it not? Yes, exactly, Your Honor. And to be clear, this title v. title argument was not presented to the district court and is nowhere to be found. The plaintiff's, the appellant's argument below was not that Empire was the title of a work and therefore Rogers doesn't apply. The appellant's argument was Empire is my corporate name, and still Rogers doesn't apply for reasons that the district court rejected because they were trying to change the law in Rogers. Well, I think, again, in fairness to them, our corporate name is Empire, I don't know, Distribution Company, and your television show is Empire, and the title of our corporate name and the title of your television show are the same. That's not what the Rogers footnote is about. I think you're right, maybe, but that, I think, is the argument. Yeah, well, that's just, I mean, then you're right back to Rogers then because you just can't call something a title if it's your trademark name and then get out of Rogers. Rogers is about two expressive works. We're not talking about two expressive works here. We're talking about their commercial trademark versus Fox's expressive works. Now, to be clear, in the appellate papers, in the appeal papers before this court, they have now moved the goalpost to try to suggest that they have all kinds of records that they released, they being the appellant, that say Empire Distribution Presents and then the name of the song. Well, that argument, again, is waived because it was not made to the court below. There was no title versus title of two expressive works contest going on in the briefing and the decision below. Counsel, let me just ask you this. It's kind of a tangent, but it's bothered me. I think it was actually your colleague here who submitted a declaration to the district court that showed that the USPTO had determined that three of the marks that were used by the defendants had been suspended. What role, if any, should that play in our deliberation? Zero, Your Honor, because by the time the court rendered its decision, at least according to the appellant and papers that they filed, two of those marks no longer were suspended. I think one may have remained voluntarily suspended, but the district court pointed out that that was irrelevant and that nobody was challenging their ownership and their trademark. This case is a little different than all the cases that I've read. Maybe you can tell me the case you think is closest. I think it's different in this respect. You are, the TV show is, to be sure, different than a record company's name, but you both are in the business, you're both aggrandizing pop recording, pop record making. And can you find me a case that's kind of like that? Because usually when you talk about these cases, they aren't like that. So the Ginger Rogers case, because you have an actress there, a film actress, who's complaining about a movie. Yeah, she's in the same business. And the reality is, Your Honor, with respect, that factor does not matter. It's just all atmospherics, you think? Well, it's not relevant to the balance that was struck. I mean, what's really going on here is in the Rogers test and in the decisions of this Rogers, is that the court needed to construct a balance between the interest of consumers in avoiding confusion and the interest of consumers in free expression and free speech. And what the court essentially decided is this. Provided that you're using the mark of another or the name of another in an expressive work, then that use will be presumptively protected, provided that there is some artistic relevance to the use of the mark. To ferret out, frankly, fraudulent or deceptive type cases, where the only reason, the only reason that the mark is being used is to capitalize on the fame and goodwill of the senior user. But if there is any artistic relevance, and that has been defined by this court in the ESS case to mean anything above zero, it's a black and white rule. Anything above zero, if there's a genuine artistic relevance, then that's the end of the inquiry. And I gather that under the Brown case, that once you establish that artistic presentation, that in the second prong, no amount of evidence of consumer confusion like you would have under Sleecraft is hardly, it's hardly relevant at all. Is that correct? That is correct, including there were cases, and Brown was one of them, where there was actually a survey that showed over 60 percent of the public were confused. However, the Brown case did clarify what that prong meant, and it meant that to avoid defaulting into a Sleecraft analysis, the deception has to be overt. It has to be explicitly misstating. They use the word explicitly indicating. So we're talking about a direct effort to associate the senior user. In this case, the district court made it clear that there was no effort whatsoever to prove any such thing. Correct. I mean, that's the farthest thing. So going back to your question, I'll close on this. The one way that this case is different from all of them, I submit to you, this is the most extreme case that has ever been submitted where a plaintiff is challenging First Amendment protection because we're talking about the use of an ordinary word in the English language according to its ordinary meaning in an artistic work of art, and no court has ever suggested that that is forbidden. So if you have any further questions, I'll submit. I think we're fine. Thank you very much. Thank you. Counsel, you have some rebuttal time. I've been touched on and questions to myself and questions to Mr. Petruccelli. There is some differences, Your Honors, between this, some big differences between the facts before the court and the facts that were before the court, Mattel and Jim Brown and Mattel. There's direct competition. And while I don't have— Let's talk about that. Mr. Petruccelli has indicated—indeed, he's given us his word—that there is no recordings, no swag, no anything like that that is, in effect, competing with you in your field. All they're doing is advertising the show. Do you disagree with that? Here's what I disagree. I agree that they're advertising the show. But the promotion of the show, putting up billboards or running ads for the show, is very different than the promotion that they're doing for the music. And I think if you go back— Well, but if it's music related to the show, what's the problem? But this isn't, I think, the sound of, you know, music. I thought it was. Well, if it was, it's not a problem. The releasing— The hills are alive, I know that. The music is being released. The music is being released, not only as these compilation albums at the end of every season, but there are EPs being released, singles, you know, being released during, you know, the weeks, you know, of the show. But it's all the show's music. You don't— If you look at Mr. Bywater's—Mr. Bywater's testimony, Your Honor, said that they have—they've signed these artists to 360 deals where they have touring agreements. They can put out a solo album. They have the right to put out a solo album of these artists where the music doesn't even have to be on the show. Is there any evidence in the record of music that has not been played in an episode of Empire that's been released? Because I thought I heard Mr. Puccitelli said that of all the exhibits submitted, it all related to music from the show itself. I think the evidence in the record is that the show, that all the music has been on the show. They have the right to do solo albums, touring, and things that aren't— But there's no evidence that that's done, been done. No. I think your time is up. Counsel—I mean, colleagues, any other questions? We thank all counsel for this—their argument in this case. Very interesting case, an important case, and we thank you for your preparation and the briefs that you submitted. Thank you all. The case just argued is submitted.
judges: Motz, M. Smith, Nguyen